United States District Court

_____ DISTRICT OF _____ **CONNECTICUT** _____

| | |
|---|---|
| **In the Matter of the Search of**<br>**(Name, address or Brief description of person,**<br>**property or premises to be searched)** | **APPLICATION AND AFFIDAVIT**<br>**FOR SEARCH WARRANT** |

The office of NOVA BENEFIT PLANS LLC, also
known as BENISTAR, located at 100 Grist Mill Road,
Simsbury, Connecticut.

**CASE NUMBER:**

**I** __Shaun Schrader__ **being duly sworn depose and say:**

**I am a(n)** __IRS-CID Special Agent__ **and have reason to believe that** __ **on the person of or** _x_ **on the**
**property or premises known as** (name, description and/or location)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut, 06070. The property is described as a single story office building. The lower portion of the building consists of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says "100 GRIST MILL RD." At the top of the driveway, as you approach the parking lot, is a wooden sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself.

**in the** _____ **District of** _____ **CONNECTICUT** _____
**there is now concealed a certain person or property, namely (describe the person or property to be**
**seized)**

*See* Attachment B.

**which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal**
**Rules of Criminal Procedure)**

fruits, evidence, and/or instrumentalities

**concerning violations of Title** __18__ **United States Code, Section** __371__ **and Title** __26__ **United States Code, Section**
__7206(2)__
**The facts to support a finding of Probable Cause are as follows:**

*See* attached Affidavit.

**Continued on the attached sheet and made a part hereof.** __X__ **Yes** __ **No**

**X** _____

**Signature of Affiant,**
**Special Agent Shaun Schrader, IRS-CID**

**Sworn to before me, and subscribed in my presence**

April **16** 2010 _____ at __ __Hartford, Connecticut__ _____
**Date**                                                    **City and State**

__Hon. Thomas P. Smith, U.S. Magistrate Judge__
**Name and Title of Judicial Officer**

_____
**Signature of Judicial Officer**

United States District Court

_____ DISTRICT OF _____ **CONNECTICUT** _____

| | |
|---|---|
| **In the Matter of the Search of** <br> **(Name, address or Brief description of person,** <br> **property or premises to be searched)** | **SEARCH WARRANT** <br><br> **CASE NUMBER:** |

The office of NOVA BENEFIT PLANS LLC, also
known as BENISTAR, located at 100 Grist Mill
Road, Simsbury, Connecticut.

**To: <u>Shaun Schrader, IRS-CID</u> and any Authorized Officer of the United States**

**Affidavit(s) having been made before me by <u>Special Agent Shaun Schrader</u> who has reason to believe that on the person of or x on the property or premises known as** (name, description and/or location)

The office of NOVA BENEFIT PLANS LLC, also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut, 06070. The property is described as a single story office building. The lower portion of the building consists of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says "100 GRIST MILL RD." At the top of the driveway, as you approach the parking lot, is a wooden sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself.

**in the** _____ **District of** _____ **CONNECTICUT** _____ **there is now concealed a certain person or property, namely (describe the person or property to be seized)**

*See* Attachment B.

**I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.**

**YOU ARE HEREBY COMMANDED to search on or before** *April 25, 2010*

**(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (~~at any time in the day or night as I find reasonable cause has been established~~) and if the person or property be found there to seize same, leaving copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to <u>THOMAS P. SMITH,</u> <u>UNITED STATES MAGISTRATE JUDGE</u> as required by law.**

____April **16** , 2010 at **1:05 p.m** _____          at ___ <u>HARTFORD, CONNECTICUT</u> ___
**Date and Time Issued**                                        **City and State**

<u>THOMAS P. SMITH</u>
<u>UNITED STATES MAGISTRATE JUDGE</u>
**Name and Title of Judicial Officer**                          **Signature of Judicial Officer**

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR**

**SEARCH WARRANT**

Your Affiant, <u>Shaun Schrader</u>, being first duly sworn and under oath states as follows:

## INTRODUCTION

1. I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation Division (hereinafter "IRS-CID") in Milwaukee, Wisconsin. I have been employed in this capacity since April 2004. As a Special Agent, I have received extensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. Throughout the course of my training, I studied a variety of law enforcement, criminal investigation, and tax crime issues, including search and seizure, violations of the Internal Revenue Laws, and Internal Revenue Service policies and procedures in criminal investigations. As a Special Agent of IRS-CID, my responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), The Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and related offenses. I have personally conducted and participated in numerous criminal investigations of individuals involved in illegal activities for possible violations of the United States Code and related laws.  During my course of employment, I have conducted investigations utilizing surveillance techniques, informants, search warrants, seizure warrants, undercover operations, securing seized evidence, and analyzing financial documents.

2.  I am submitting this affidavit in support of an application for a warrant to search the office of NOVA BENEFIT PLANS LLC (hereinafter "NOVA"), also known as BENISTAR, located at 100 Grist Mill Road, Simsbury, Connecticut for evidence related to a scheme to defraud the IRS. The NOVA office is further described in the narrative description contained in Attachment A.

3.  This affidavit is based upon my personal knowledge, records and information that have been previously obtained by investigation, subpoena, interview, and/or provided by other law enforcement officers as part of an ongoing investigation involving NOVA and related entities and individuals. I respectfully submit that there is probable cause that the NOVA office at 100 Grist Mill Road, Simsbury, Connecticut contains evidence of violations of Title 18 U.S.C. § 371, that is, a Conspiracy to Impede the Lawful Function of the IRS, and violations of Title 26 U.S.C. § 7206(2), which is Assisting in the Preparation of False Income Tax Returns.  Nova, its principals, and employees are committing these violations through the promotion and administration of abusive 419 welfare benefit plans; these plans are described more fully below. The items to be seized as evidence of these violations are described in Attachment B to this affidavit.

## BACKGROUND

4.  Over the past eight months, IRS-CID has been conducting an investigation of NOVA and related entities and individuals. According to a NOVA marketing brochure, the company offers comprehensive welfare benefit plans – with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage.

5. This investigation has been conducted by way of an undercover operation wherein a cooperating witness (hereinafter "CW") and several IRS-CID undercover agents (hereinafter "UCAs") have penetrated NOVA to ascertain its business purposes and operation. This investigation has revealed that NOVA, along with its related companies, is promoting and administering abusive 419 welfare benefit plans (419 welfare benefit plans are described in more detail below).  The end result of the abusive 419 plans is that individual participants are able to violate the Internal Revenue Code by claiming the most minor of injuries (e.g. minor scars, broken wrists that fully heal) as instances of permanent disablement and disfigurement, and in so doing, make themselves appear qualified for tax-favored treatment under the Internal Revenue Code.  The actions of NOVA and its employees also resulted in the provision of false and misleading documents to the IRS; documents which were either backdated, allowing their clients to claim deductions for years in which no contribution was made, or which overstated their clients' tax basis, consequently understating their tax liability.  The backdating of 419 plan documents, the intentional provision to the IRS of false documents which overstated their client's tax basis, and the mischaracterization of their clients' minor injuries as instances of permanent and total disability or disfigurement were the means by which NOVA aided and assisted its clients in filing false tax returns.

6. By using a 419A(f)(6) plan, a business/employer can contribute money, which is deductible as a business expense, to the plan on behalf of a covered employee/beneficiary. Then, with the assistance of NOVA, at a later date the covered employee is able to obtain the money contributed to the plan by the employer substantially tax-free either through a questionable disability or by

terminating the plan and representing to the IRS an overstated basis in the insurance policy when the policy is cashed out.

7. Disability payments are generally not includable in income under Section 105(a) of the Internal Revenue Code. The applicable standard for tax-free receipt of disability payments is the permanent loss of a member or function of the body (or permanent loss of the use of that member or function), and the specific examples given include the loss of an eye, the loss of substantially all of the vision of an eye, and the loss of substantially all of the hearing in one or both ears.

8. As stated, NOVA also counseled its clients to underreport and underpay their tax liabilities through a misstated basis ("tax basis", as is relevant here, is the cost of an asset, and its cost is the starting point for determining gains or losses for income tax purposes when the asset is sold, or when some other taxable event occurs) when the 419A(f)(6) plan is terminated and the insurance policy is cashed out by the individual. In essence, NOVA is providing a blueprint, and the means, for business owners and individuals to criminally underreport their taxes.

9. Evidence has also been uncovered showing that an employee of NOVA coached a client and his representative to backdate documents in order for his company to receive a 419 plan deduction in a year where no contribution was actually made. In doing so, NOVA assisted a taxpayer in potentially obstructing the IRS in the ascertainment, computation, assessment, and collection of taxes.

10. Because this affidavit is provided for the limited purpose of establishing probable cause to obtain a search warrant, I have not included all aspects of the investigation,

but rather have set forth only those facts that may be necessary to establish probable cause.

## DESCRIPTION OF 419 WELFARE BENEFIT PLANS

11. 419 welfare benefit plans, also known as 419 plans, derive their name from Section 419 of the Internal Revenue Code (hereinafter "IRC") which governs contributions to a welfare benefit plan. A 419 plan is an arrangement, usually pursuant to a written document, under which an employer provides welfare benefits to employees. A 419 plan, as intended, permits a corporation to deduct under IRC § 162 the ordinary and necessary business expense of the annual cost of providing life, disability, and severance insurance coverage to its employees through a welfare benefit trust.

12. In general, contributions to a welfare benefit fund are deductible when paid, but only if they qualify as ordinary and necessary business expenses of the employer and only to the extent allowable under IRC Sections 419 and 419A. Those sections impose strict limits on the amount of tax-deductible prefunding permitted for contributions to a welfare benefit fund. IRC Section 419A(f)(6) provides an exemption from IRC Sections 419 and 419A for certain welfare benefit funds that are part of a "10 or more employer plan". Employers that participate in welfare benefit funds which meet the requirements of 419A(f)(6), and the regulations thereunder, may be able to deduct the full amount of their contribution to a welfare benefit fund without reference to the general deduction limits of Section 419. This means that if an employer contributes to a "10 or more employer plan", the IRS allows the business to expense an unlimited contribution amount in the year the contribution is made.

13. In addition, a 419 plan is a non-qualified plan, as opposed to a qualified plan such as a 401(k), meaning that employers do not have to fund the 419 plan for all employees; employers can be selective and fund the plan for as few as one or two employees.

14. If the plan is administered properly, beneficiaries of 419 plans are able to receive a distribution only by filing a valid claim for a triggering event such as severe illness, disability, disfigurement, or death. If a valid claim is approved, the beneficiary can receive a distribution from the plan, usually tax-free.

15. Some 419 Plans claim to provide welfare benefits such as disability, disfigurement and death, but in operation, distribute disguised dividends or deferred compensation in a manner designed to circumvent the applicable rules and regulations under the IRC. Plans that operate in this manner are commonly referred to as "abusive 419 tax shelters".

16. A "listed transaction" is a reportable transaction that is the same as, or substantially similar to, a transaction specifically identified by the IRS as a tax avoidance transaction. In 2000, the IRS published Notice 2000-15, in which it formally "listed" 419 transactions (along with other transactions identified in an earlier notice, 95-34) as tax avoidance transactions which, in the view of the IRS, subject the 419 program to the disclosure requirements of IRC Section 6112 as "potentially abusive tax shelters".

## CONFIDENTIAL WITNESSES' CREDIBILITY

17. During this investigation, a confidential witness (CW), pursuant to a proffer agreement, provided information to the Government regarding the activities of NOVA

and related entities and individuals. I believe the information provided by the CW is truthful and reliable because the information was consistent with evidence obtained elsewhere in this investigation and substantial portions of the CW's information have been corroborated through independent investigation, including recorded conversations, review of documentation provided by the CW, and review of information on file with the IRS, such as tax returns and tax return information.

## INFORMATION PROVIDED BY COOPERATING WITNESS

18. Information received from the CW indicates that NOVA is promoting and administering abusive 419 welfare benefit plans. The CW is an independent insurance broker who sold NOVA 419 plans to numerous clients in the Milwaukee, Wisconsin area. The CW sold 419 and 412i plans through NOVA and their predecessor Benistar since at least 2002. The CW said that 412i plans were similar to 419 plans; however in 2005, IRS rules changed and 412i plans became less attractive compared to 419 Plans. Included in documents turned over to case agents by the CW were legal opinions provided to the CW by NOVA as promotional material. The legal opinions, drafted by an attorney, indicate that NOVA's 419 plans comply with the provisions of IRC § 419A(f)(6)[1].

19. The CW gave the following overview of how the NOVA/Benistar 419 plans work:

- A business/employer enrolls in the 419 Plan with the plan administrator, NOVA, and pays an enrollment fee.

---

[1] These legal opinions are identified among the items to be seized. *See* Attachment B, Nos. 8-9.  Because they were routinely included in promotional literature, they are not privileged. With respect to other legal documents that might otherwise be privileged, the United States will utilize a filter team procedure to ensure that the case agents and the prosecution team will not have access to privileged documents.  Potentially privileged documents will be segregated and logged for later reviewed by a designated filter team.

- The business sends its contribution amount to a trust administered by NOVA. One such trust has been identified as the Sickness, Accident, Disability and Indemnity Trust (SADI Trust).

- NOVA keeps 5% of the contribution amount as their administration fee.

- The business can deduct the full amount of the contribution on their tax return as an employee benefit program since the NOVA plans in question purport to meet the requirements of IRS Section 419A(f)(6).

- The trust purchases an annuity or life insurance policy from a legitimate insurance company; the trust becomes the owner of this policy and the covered employee becomes the policy's beneficiary.


20. Per the CW, NOVA knowingly administers their 419 Plans in a way that allows clients to use the plans as abusive tax shelters. Per the CW, NOVA is allowing beneficiaries to abuse the Plans in at least two ways:

- First, NOVA approves virtually any disability/disfigurement claim that is filed by a beneficiary, no matter how frivolous. Upon approval, the proceeds of the plan are paid out to the beneficiary, usually tax free, over 60 months. For example, one of the CW's clients filed a claim for having a wart removed that left a small scar described as only the size of a pencil eraser. NOVA approved the claim, treating that eraser-sized scar as a disfigurement, and is currently paying out the full policy amount, less fees, over 60 months. The CW has had conversations with Wayne Bursey, who the CW believes is the head of NOVA, where Bursey said that if a beneficiary wants to get money out of the plan, NOVA encourages them to file a claim because NOVA has made it so easy for a claim to be approved.

- Secondly, NOVA allows businesses to terminate participation in their 419 Plans. When an employer terminates their plan, NOVA gives the beneficiary (the covered employee), the option of doing a "buy out" for a fee of 10% of the policy's cash value. Once the beneficiary buys out the plan they become the owner and beneficiary of the annuity or life insurance product and have the ability to cash out the policy. NOVA reports nothing to the IRS at the time of the buy out regarding the change of ownership. If the owner/beneficiary decides to cash out the policy, they receive a Form 1099 from the insurance company that held the annuity or life insurance contract if the cash out amount exceeds the original purchase cost, or basis. If the cash out value does not exceed the purchase cost, the beneficiary may not even receive a Form 1099. The Form 1099 issued to the owner will reflect the basis of the original purchase amount of the annuity or life insurance policy; however the basis reported on the Form 1099 is not the proper basis for the beneficiary because the insurance/annuity company is unaware that the ownership of the policy has been transferred from the trust to the beneficiary. The beneficiary should have zero basis in the policy since the business, not the beneficiary, made the contribution. Due to the incorrect basis, the Form 1099 shows that the taxpayer owes little or no taxes. Therefore, the beneficiary is able to receive the full cash value of the policy tax free for a fee of 10%. The CW stated that NOVA knows that 1099s issued to the beneficiary by the insurance company do not reflect the basis of the owner/beneficiary. In essence, with the termination and cash-out, a company is able to take a large corporate deduction in addition to allowing an individual to get money out of the corporation tax free.

21. The CW provided information on 14 employers who he assisted in setting up NOVA and/or Benistar 419 Plans. Some of the employers utilized more than one 419 plan. The employers' 419 Plans had contributions totaling well over $8 million. With all the Plans that the CW helped set up, the only employees the employers covered under the Plans were company principals or relatives of the principals. Thus, the Plans were clearly being used as a way to provide benefits to only the principals of the companies.

22. The CW sold the 419 plans to his clients as purported disability plans with the ability to get money out tax free. Of the 419 plans set up by the CW, nine plans, totaling over $4 million in contributions, have been terminated by the businesses and cashed out by the beneficiaries. In addition, multiple claims set up by CW had disability claims approved that totaled approximately $1 million.

23. I reviewed tax return information and tax returns for the 419 plans set up by the CW that were terminated and cashed out to determine how they were treated for tax purposes. In all of the instances, the employers took a deduction for the full amount of the contribution to the 419 plan in the year the contribution was made. For six of the companies, contributions to 419 plans and the subsequent deductions actually created a loss for the company by reducing ordinary income below zero. Following the termination of the plan by the employers and subsequent buy-out by the beneficiaries, the plans were cashed out. In only one instance was the proper basis used by the beneficiary on their personal tax return. In the remaining cases little or no income was reported on the tax returns because the original cost basis of the corporate contribution was used to determine the taxable amount for the individual.

Due to the use of improper basis, the individuals were able to evade the payment of taxes on the money they received from cashing out their policies.

24. The CW provided information showing that NOVA and Benistar set up and administered various trusts for their 419 plans, including Benistar 419 Plan and Trust; Benistar 419 Advantage Plan; NOVA Sickness, Accident, Disability, and Indemnity Trust (SADI); NOVA Long Term Care Trust; NOVA Life One Plan & Trust; and Grist Mill Trust.

25. The CW also indicated that NOVA's 419 Plans may not actually qualify for the 10 or more employer exemption in accordance with 419A(f)(6). In a 10 or more employer plan, the contributions of all of the employers are supposed to be pooled together and accounted for as one plan. However, NOVA appears to be accounting for each employer separately. For example, NOVA purchases an annuity for each individual beneficiary. If the beneficiary files a claim or terminates the plan they are only entitled to the amount in their individual policy.

## UNDERCOVER CONTACTS WITH NOVA

26. On October 21, 2009, the CW placed a monitored phone call to Guy Neumann. Per the CW, Neumann is a high-level salesman for NOVA who works directly under the head of NOVA. Based on his dealings with NOVA, the CW believes the head of NOVA is an individual by the name of Wayne Bursey. During this phone call, the CW told Neumann that he had a potential client who was interested in investing a large amount of money into one of NOVA's 419 Plans. The CW told Neumann that the client and his accountant wanted to set up a conference call to discuss 419 plans further. Neumann agreed to a conference call with the CW, the client and his

accountant. On October 29, 2009, a monitored conference call was held between Neumann, the CW, UCA1 (who played the role of a business owner who was interested in investing $1,000,000 into a NOVA 419 plan) and UCA2 (who played the role of UCA1's accountant and financial advisor). During the conference call, NOVA's 419 plans were discussed in detail. On January 12, 2010, UCA2 and UCA3 (an individual UCA2 introduced as his business partner) traveled to NOVA's office in Simsbury, CT. The purpose of the trip was to conduct a monitored face-to-face meeting with representatives of NOVA in order to discuss details of NOVA's 419 Plans and other related "tax strategies". The following individuals, representing NOVA and NOVA related entities, were involved in the monitored conversations: Guy Neumann, Wayne Bursey, Daniel Carpenter, Stefan Cherneski, and Kevin Slattery. Below is a summary of pertinent information obtained during the undercover contacts:

27. During a monitored conversation on October 29, 2009, Neumann described welfare benefit plans to UCAs 1 and 2 as follows:

GUY NEUMANN:     What I'll do is I'll give you kind of like a 30,000 foot perspective overview of how these Welfare benefit plans work. Then what we'll do is you kind of have to back in to which of our plans make sense.  We administer about a dozen different plans.  They all have different types of features and they are used for different types of benefits. [The CW] is an expert in these plans.  He's done a lot of work with us so his judgment is that -- his opinion was that SADI will work best.  And I probably fully agree with him. But in essence what we do have here are welfare benefit plans that are    basically established under Code Section 419 and 419(a).  That's Internal Revenue Code 419 and 419(a).   These particular plans purport to make the exception on these -- on this code sections. Basically what they do is enable an employer on a discriminatory basis, meaning you don't have to provide the rank and file employees with this benefit, to take revenues or money from the corporations, contribute it to the plan, take your tax deduction on these contributions.  So the contributions

in the plan fund a life insurance or an annuity, which is protected, meaning it provides a benefit. They basically range in our benefit obligation. In the case of the SADI trust, they range from a disability indemnity benefit along with a death benefit as a secondary benefit. They are completely protected from the hands of creditors. That is business as well as personal creditors. The funds then get paid out to the extent there is a benefit trigger on a tax advantaged basis. They come out tax free. And the death claims are paid out outside the estate; income, estate, and gift tax free. So in that sense what you are able to do in a nutshell is buy these insurance, assuming a 40 percent tax bracket at a 40 percent discount. So you are buying the life insurance or the annuity on a 40 percent discount. The SADI trust basically enables you to make one contribution or five contributions of even amounts. It's either a one pay or a five pay. And we take the contributions made to the trust and we fund either an annuity, and that's a lump sum annuity, or in the case of a life insurance contract, we fund it through the course of three years in the trust to avoid MEC rules. And you can go over with your client what that means. And then if it's a five pay, we just put an even contribution into the policy through the course of five years. That's in essence the structure of the plan. They were designed historically to provide employers that generate the revenues necessary today to take care of themselves in the future. So basically it's like a rainy day fund. Use the funds you have today for that rainy day in the future. So you use the funds you have today while you have them.

28. Neumann and the UCAs discussed in detail how an employee participating in a 419 Plan would be able to access money in the plan at a later date. Neumann explained that there are basically two ways for a covered employee to access the money. First, the covered employee can file a claim with the plan for a triggering event such as a disability or disfigurement. In the case of an approved claim, the trust will pay out the full amount of the benefits to the employee tax free over a five year period. Secondly, the employer can terminate their participation in the plan. If the employer terminates the plan, the trust gives the covered employee the option of purchasing the policy from the trust and at that point, the covered employee would become the owner of the policy and have the ability to cash out the policy. Below are details related to the

filing of a claim and the termination of a 419 plan, and subsequent buy-out, that were discussed during the monitored conversations.

**Filing and Approval of Claims**

29. As stated above, one way for a covered employee participating in a 419 plan to access money in the plan is for that employee to file a claim for a disability or disfigurement. NOVA encourages participants to file claims because they have so loosely defined disability and disfigurement that they approve just about any claim that is filed by a beneficiary no matter how frivolous. Evidence has shown that the board that approves claims, which is supposed to be independent by law, is actually controlled by NOVA. The trustee of the board is Wayne Bursey. Neumann also sits on the board.

30. In regards to the filing and approval of disability and disfigurement claims, the following exchange took place during the monitored phone conversation on October 29, 2009.

UCA 2: So if (UCA1) here wanted to later on, you know, access his money somehow, how would that work?

GUY NEUMANN: Well, there's a few different ways to skin this cat. The best possible way is through benefits. And, again, we have a very loose definition for disability benefits and it is basically any dismemberment or disfigurement, any bodily function, or any body part. So how does that work? That means that if you have been in the plan for a year, you are eligible to submit a claim. We have up to a year to pay that claim. So if you submit a claim right after you came into the plan, you are looking at three years before you actually start getting paid assuming the claim gets approved. To the extent you have surgery. To the extent you can't use any of your bodily functions for any period of time regardless of whether you are still working or not, you break an arm, or cut your face, they are all legitimate disability claims under the plan. At that point, we would take the amount of time

14

you have been into the plan, the contribution level that you made, put into that formula we just discussed, and we pay your benefits under the formula.  (Inaudible) a multiplying factor of 120.

31. In regards to the board that approves the claims, the following exchange took place on October 29, 2009:

GUY NEUMANN:      Well, there's a claim process, it's a claim formula.   In essence what you need to do is have a doctor tell us you have any type of disability.    Any, dismemberment, disfigurement, any bodily part function.  If you had surgery (inaudible) you broke your leg (inaudible) playing sports, (inaudible) and that claim gets reviewed by a Board, which is – which is overall supervised and directed by a trustee, an independent trustee.   A gentleman by the name of Wayne Bursey.

UCA 2:                      Okay.

GUY NEUMANN:      Now, again, it is in our best interest to pay out claims because it makes us look more like a legitimate welfare benefit plan.

UCA 2:                          Right.

GUY NEUMANN:      So we are in the business of paying out claims.  We are definitely pro claims.  And it's very important to understand this is an indemnity benefit versus a reimbursement benefit.  You don't have to provide any type of support for the payments you made.

32. Later in this meeting, in regards to how any injury, however inconsequential, would qualify as a disability or disfigurement, and as to the percentage of claims that NOVA denied, the following exchange took place:

CW:                           You know, looking at the -- at, you know, when we're looking at filing a claim, I always encourage everyone to stay in the plan for the benefit and, you know, to file a claim and, you know, as you said earlier, firstly because it's a self-funded plan, you know, the requirements of meeting

15

the benefit hurdle is reasonable.  So, you know, one of the things that, you know, (UCA1) had kind of asked me was, well, I mean, do I have to, you know, lose a leg in a car accident or, you know, lose all my vision?  Or, I mean, at what -- am I so disabled I can't enjoy the money anyways or, you know, so I -- I told him, well, I've had a few clients go through like a hip surgery and -- but also, you know, recently, I don't want to say the client's name, but he went through a minor -- some minor surgery, had a little -- had a mole removed off of his elbow I think and left a little scar the size of a pencil eraser, and, you know, that -- that qualified.

GUY NEUMANN:   The definition, (CW), is any dismemberment or disfigurement, any bodily part or function. I'm not going to mention obviously the client's name, but one of our clients who is a multi-million dollar contributor to the plan over the course of the last five years went through a really nasty divorce down in Florida.  And as a result of the stress and everything that has taken place, actually a young fellow, he suffered serious impotency.  It happens.  And that was enough to claim from the plan.  The doctor wrote us a note.  And that was a legitimate enough claim.  We had one other individual that slipped and fell on some ice, ended up breaking his wrist and needed surgery on his wrist.  He's perfectly fine today.

CW:   Okay.  Then --

GUY NEUMANN:   That was the claim.

CW:    -- the other question, unlike a lot of disability plans where, okay, if I -- if I lose my finger, I get X dollars.  If I lose a -- you know, an arm I get, you know, five times X.  If I, you know, paraplegic, I get 95 times X.  I was telling (UCA1) in this case any qualifying event triggers a full payout of your -- of your contributions based on the benefit formula.  But it's paid out equally over a 60 month period.  And that's correct?

GUY NEUMANN:   That is absolutely correct.

CW:   Okay.

GUY NEUMANN:   And I said that earlier in the conversation, but we are an indemnity benefits based plan so the reimbursement plan, you would be reimbursed for the type of injury or disability you incurred.  So the more severe the injury, the more you get reimbursed. The indemnity plan, we have just one formula that's in that brochure that we discussed based on the amount of time you've been in the plan, the overall

experience in the plan, the size of the contribution, we determine how much you get. And that number is fixed during the course of 60 months regardless if you have a two inch scar or you lost a limb.

UCA 2:          Okay. All right.

CW:             And, Guy, like what percent of the claims that get filed, you know, are okay?

GUY NEUMANN:    We've never denied a claim. The only time we denied a claim is when we found out that somebody had an injury and then put into the plan a contribution. Like they -- they got -- you know, they learned that they are -- they had some bad illness. And the only reason we learned that is because the broker told us after, after it. So after the plan the broker basically stopped the client's -- so, you know.

UCA 2:          So in essence we could make this welfare contribution and in three years if (UCA1), let's say, had a medical injury, we could file a claim and, you know, if we go through the approval process, I think you mentioned that there's a Board that it goes to, claims department?

GUY NEUMANN:    I actually sit on the Board. But the trustee is also on that Board. And you got to look at it from a different perspective. If we get challenged on whether we are a legitimate welfare benefit plan or just a way for wealthy individuals to put money in and take tax deduction, there's nothing that looks better in the court of law than paying a death claim, of which we paid over a hundred million dollars on, paying a disability benefit.

UCA 2:          Okay.

GUY NEUMANN:    Then it puts us in a better position. So that's why the definition, which is basically taken out of the IRS guidelines specifically. We didn't just make up language using the disability language, which is found in our plan document. It was taken out of a legitimate source, reputable, qualified source.

UCA 2:          Right, okay.

GUY NEUMANN:    And we use that. So, again, when I go out to the market, into the country, and I do these seminars on these plans, I basically say, the best way for you to benefit from the plan is to find a way to get disabled. Now, of course if you take that literally and say, well, I am going to have to crash my car or lose a leg, no. You know, I -- in the last -- I'm a healthy guy, you know, and I have no issues whatsoever,

healthy.  But I have been in two minor surgeries in the last -- in the last two years that left me with some scarring. That would be enough to claim on this plan.  Okay?

33. Further conversations in regards to the filing and approval of claims took place at the monitored face-to-face meeting held at NOVA on January 12, 2010. Below is an exchange again showing that virtually any disability or disfigurement claim would be approved by the board, due to NOVA's control over the supposedly independent board:

UCA3:  Okay, well let me go to the first way.  So if he's saying, if he's let's say four years later, um you know he's, he's semi retired, he's still a figurehead in the company, so what does he do?  He files a claim for a disability?

GUY NEUMANN:  It's a form that we can provide you with.  He needs a doctor note and there's an explanation on the…

UCA3:  Now do you guys have doctors here that review this? How, how hard is it…

GUY NEUMANN:  No, the doctor just has to, the, the doctor, the doctor doesn't need to approve the disability benefit.  The doctor just needs to say yeah he's had surgery and as a result of that surgery he's had stitches or disfigurement or dismemberment…

UCA3:  All right so he cuts boxes…

STEFAN CHERNESKI:  Or as we said earlier, erectile dysfunction, what, is the doctor gonna check?

UCA3:  Hm, so he's going in there…

(Participants are laughing and kidding about the dysfunction problem.)

UCA3:  All right so, so the claim, so the claim process is as simple as can be as, I mean and it's gonna go through now, but, how much scrutiny is that gonna get, we can get any doctor to write anything, right?  We can get anybody to write anything…

GUY NEUMANN:  There's no scrutiny on that 'cause…

18

UCA3:                    …on, on your end here?

STEFAN CHERNESKI:        Trust me you won't.

GUY NEUMANN:         Liss, listen…

UCA3:                    The trustee.

GUY NEUMANN:         …I, I'm gonna put this very simply for you, we control the trustee, okay, and I, I don't mean that in a bad way.  He's independent but he's part of the family and we control the stuff that happens, we have ways to make stuff happen, there's not a question about it, I'm not just saying that in a shady kind of a way, but it's true we all work together.  He doesn't get paid unless we have a plan that he needs to be the trustee of, so, and the reality is that we're all benefit motivated. It's best for us to pay out as much claims so when it times for us to fight this in tax court, we can play and sing the welfare benefit song.

UCA2:                    We, we paid out these claims…

GUY NEUMANN:         Exactly.

STEFAN CHERNESKI:        Yeah we're a legitimate plan.

UCA2:                    Right.

GUY NEUMANN:         There's no question our primary benefit is disability, there's a secondary benefit which is the death benefit, 80-percent of, these are all, we don't pick 80-percent out of hat, there's legal justification for the 80-percent.  There's legal justification for the primary benefit.  Ah the formula used again, Ira Cohen, Chief Actuary for the IRS, these are things that are gonna help us in tax court and then when you have people with legitimate claims, we're good.  Listen Lincoln has a product, nobody's gonna argue with Lincoln, it's called Moneyguard?

UCA3:                    Yeah.

GUY NEUMANN:         They are also on this, on the street talking about how easy it is to get a, a long-term care benefit out of them.  Most insurance companies do two incident ah activities of daily living; for them it's one.  Okay?  So who at 80 can balance a checkbook?  All right.

                          (Participants are all laughing and some quick comments are made.)

| | |
|---|---|
| GUY NEUMANN: | So, so is the government gonna come after them, you know, to scrutinize whether these benefits should be taxable or not? Naw, they're Lincoln. You know what I'm saying? The point is that the government is not in the business of justifying claims. They're not gonna tell you shouldn't charge this for a claim, or this is not a legitimate claim. It's too much for them. |
| UCA3: | So no matter what the disability is, the standard, the payout is the one… |
| | (A couple of participants are talking at the same time.) |
| GUY NEUMANN: | Again any dismemberment, any dismemberment of any, any bodily part or function; surgery, loss of vision, loss of eye, loss of usage, anything, you know… |
| UCA3: | So he's cutting a box open, boxes are coming in, he cuts a box, cuts himself and gets three stitches… |
| GUY NEUMANN: | I don't suggest for him to get a knife and cut himself with but… |
| UCA3: | But, no, it happens… |
| GUY NEUMANN: | …I, I'll do some crazy stuff, you know. |
| UCA3: | …he got, all right here, I got, I got three stitches right here, you know, I got six stitches… |
| STEFAN CHERNESKI: | Yeah. |
| GUY NEUMANN: | Yeah, that'll do it. That'll do it. |

34. Later during the same conversation, the following exchange takes place, further demonstrating that NOVA exercises control over the board, which should be independent:

| | |
|---|---|
| UCA3: | …. Okay. I mean, I, to me I can't see where anything can go wrong or anything wrong with this other than, you know, is the claims gonna be disallowed or is there gonna be some scrutiny. Now who's on the board that reviews these claims? |
| GUY NEUMANN: | You got the trustee… |

| | |
|---|---|
| UCA3: | Now you guys pay the trustee; he's in your back pocket, he's gonna go along with you.  But, is there other people on the board beside the trustee? |
| GUY NEUMANN: | I, I, I sit on the board.  There's a, ah, the chairman of Bass(ph) he sits on the board.  The head administrator sits on the board. |
| UCA3: | Now is this a unanimous vote that it's got to be approved by everybody there or this more… |
| GUY NEUMANN: | No. |
| UCA3: | … just a procedural thing that just… |
| GUY NEUMANN: | Procedural thing, that's it. |

35. During the same conversation, the following exchange takes place where the NOVA representatives state that they have never denied a claim, with one exception, where the claim form was filled out incorrectly:

| | |
|---|---|
| UCA3: | …okay, but I'm not talking, I wasn't, I didn't mean lose the money in that, the company goes out of business or that.  I mean lose the money in that there is, he's not able to get it back out. |
| GUY NEUMANN: | Right.  So, again, let's look at this, ah and you have to look at this objectively in order to appreciate this; people challenge us on a daily basis on whether we're a legitimate welfare benefit plan or a deferred comp plan, in our best interest is to pay as much claims and act like a small insurance company which this code section is all about, providing a service to an insured, the relationship is like an insurance company to insured as opposed to an investor to a fund.  Okay?  So it is in our best interest to have claim forms completed and reviewed and we have never denied a claim to the best of my knowledge, the only time that we denied a claim is when… |
| STEFAN CHERNESKI: | We had to re, we had to resubmit the claim form because they filled it out incorrectly. |
| GUY NEUMANN: | …exactly. |

36. At this same meeting on January 12, 2010, the following exchange took place in which Trustee Wayne Bursey makes statements that it is unlikely a claim would ever be denied, and that a small scar is sufficient to make a claim.

| | |
|---|---|
| GUY NEUMANN: | Wayne, you know, one of the things that ah, we're working on a case together right now and ah the client's looking to put about a million dollars in a SADI, whether it's gonna be a annuity most likely or a life insurance, which we're gonna look at, he's got some issues maybe with insurability. But, ah, his main concern obviously and he sent his advisors here to meet us so they can see that we are in a brick and mortar and, you know, his concern is that the money is not gonna be gone, but is there in the trust, the big concern they have is, if they have a legitimate claim which as you know is fairly loosely defined, you know, what is the likelihood of them not getting the claim paid out? |
| WAYNE BURSEY: | Very unlikely.  Ah the reason that I say that is that, unlike most insurers, we're just the opposite.  The, the insurance companies wanna keep their loss ratios down so they look at trying to not pay your claim as opposed to paying your claim.  We pay the claim because it's, it's the company's money that you're putting in for the portion to begin with.  We wanna see that benefit paid off to that employee… |
| UCA3: | You just giving him back his money. |
| WAYNE BURSEY: | …or participating employee.  We don't care.  You know the employers put the money in, we're investing it in some conservative annuities or life insurance policies, it comes time to get for somebody to get paid, then I look at each one of these claims, as a matter of fact I had a ah, I forget the lady's name, but ah she had ah she was on a motorcycle, fell down, didn't hurt herself that bad but she had a cut across her eye, and um, I had to deny, deny the claim until she, but I told here that she could appeal the claim and these are the things that I needed for the appeal and that was a photograph from the doctor, another um, ah, testimony from the doctor that she's gonna have a scar for the rest of her life, it's things like that, and, and she got, got that information to me and we paid the claim. |

37. Later at this same meeting on January 12, 2010, the following exchange took place

where Guy Neumann guarantees that any claim submitted will be approved as a

disability:

| | |
|---|---|
| UCA3: | All right, let's, let's look at that side of it, okay, I mean, I think this is, and my recommendation to (UCA1) is to be, do this, you know, you're guaranteed to get your claim approved.  You're gonna get you're money out in five years.  You're gonna get it tax free.  You're not gonna get a lump sum, which you, you don't need a lump sum because you're getting it over 60 months, tax free checks and you're guaranteed to get this. You can't go wrong.  So as long as, you know, I'm sure he can come up with something, you know in five years that he's gonna need to have done... |
| GUY NEUMANN: | Exactly. |

38. In a different meeting, later in the day on January 12, 2010, the following exchange

took place regarding the approval of claims:

| | |
|---|---|
| UCA3: | I, I, I don't, you know, I, I, we looked at it, we drove around, and we looked at your office basically and I was actually, it was a lot bigger operation than I thought it was.  I'm not as worried about that.  I'm more, you know, the IRS portion, the deduction, the claim, if it's filed, that you guys are gonna rubber-stamp that baby and send it back to us, right?  I mean that's how it is. |
| GUY NEUMANN: | Listen, okay, you have my assurance, you don't know from a hole in the wall but, I can promise you that ah, to build relationships, ah, it takes some, ah, you know, some behavior that's backed by action.  We got introduced to you by somebody on a vacation that, that spoke highly of you ah, the reality is I've done $10 million of premium with (the CW), and, a couple of his clients had an issue with a carrier or something, we never turned our cheek.  You know, we, we helped along the whole way.  If you want references, I can give you references from here on under, um, I don't think I have a person in the country that's gonna say a negative word about me.  We have issues with people that contribute money to the plan, ah and all of sudden forgot what they were participating in when the |

economy went bad and they have another contribution due and all of sudden the insurance product is not performing they way they expect it to and it's like, that's not our problem.  You know, like we'll do the best we can to help you but we have the integrity of the plan to maintain, so you might think I'm an [expletive deleted] then, if I tell you look the benefit is forfeited unless you make a contribution or buy the benefit out; you don't wanna do either one.

UCA3:              We don't wanna…

GUY NEUMANN:     That's the worst case scenario.  As far as everything else is concerned, we're very reputable; we are in this for the long haul.  I'm surely not trying to…

UCA3:              And you guys have been doing that.  But I mean on the side I, I don't want complications say, all sudden say, hey man we're gonna have to tighten down our rules on when we are gonna approve these claims.

GUY NEUMANN:     That, that's not changing.

UCA3:              That's not…

GUY NEUMANN:     That's not changing…

UCA3:              …that's gonna be, you guys got it all in-house.  You've got full control…

GUY NEUMANN:     The only issue you have is the tax, the only exposure you have is the tax exposure.  Everything else is, we control, you know.  We can't control what the IRS does. We can do our best to defend it but that's the only thing that's the unknown.  Everything else is, is, is tight…

## Plan Terminations and Buy-Outs

39. As stated above, the other way for a covered employee participating in a 419 plan to access his or her money in the plan is to buy out the policy from the trust after the plan has been terminated by the employer.  The exchanges below demonstrate that NOVA counsels its clients and their representatives to take advantage of misleading Forms 1099 that are issued by the insurance companies when the policies are cashed out. The Forms 1099 are false (through no fault of the insurance company) because they represent the basis of the funding corporation and not that of the

individual. The Forms 1099 make it appear that the individuals funded the insurance policies with after-tax income, when in reality, they were funded with pre-tax corporate funds. The result is individuals can evade payment of tax when they cash-out their policies.   According to Neumann, the termination process differs for annuities and life insurance policies, but in essence, for both, when the employer terminates their participation in the plan, the beneficiary is given the option to purchase the policy for 10% of its cash value. The termination process for each is described in more detail below:

**Annuities**

40. The following exchange took place during the monitored phone conversation on October 29, 2009.

GUY NEUMANN:   Okay, very good.   So to the extent that the employer chooses to no longer participate in the plan or can no longer meet his admin fee of $1500 a year obligation, the client will be required to terminate.  When you terminate, just like you would in a health insurance benefit or something like that, there's COBRA and HIPPA.  You got to have the ability of the participating employee to continue the benefits outside the plan.

UCA2:   Okay.

GUY NEUMANN:   So in the case of an annuity, you can buy the benefit out for 10 percent of the value of the annuity.  So you put a, you know, a hundred thousand dollars into the plan and the annuity is worth a hundred thousand dollars, if you get out of the plan, there's a termination fee of 2500 and you pay 10 percent of the underlying annuity value and you buy the annuity out of the plan.

UCA2:   What would be the tax consequence of buying out that annuity?

GUY NEUMANN:   Well, since there's no distribution, which is something that we can't do, then there is no tax consequences.  So in that

|  |  |
|---|---|
|  | sense, that's the same tax consequences you get for buying a vehicle or any other asset. |
| UCA2: | Okay. |
| GUY NEUMANN: | There is none.  So in essence you're buying the benefit out of the plan for the purpose of buying the benefit. |

41. The following exchange also took place during the monitored phone conversation on

October 29, 2009.

|  |  |
|---|---|
| CW: | Okay.  You know, I just wanted to just -- I know this has been going on a little longer than we probably anticipated.  But I just had two – two things that I want to clarify because they might come up here when I talk to (UCA2) later.  One is if he decides to sell the company in three years and we haven't done this ESOP or that's not going to work for us and there's not a claim, he terminates the plan, he wants to get the cash or his funding policy back, then he can buy it out for the 10 percent per year, per your e-mail to me, from the trust? |
| GUY NEUMANN: | Not on the life insurance.   Annuity 10 percent.    Life insurance collateral assignment. |
| CW: | Life insurance collateral assignment.  Now, I told him, you know, in the past the trust does not send out a 1099 or anything on that. |
| GUY NEUMANN: | There's no 1099 on anything we talked about.   The last thing you want to do is award the IRS with any information that they don't even have. |
| CW: | Okay.  And then he-- and then he sends the money to you guys, to the trust personally, and then there's an ownership transfer of, let's just say an annuity for ease of discussion, and then he owns the annuity and he can do anything he wants with it. |
| GUY NEUMANN: | Right. |
| CW: | Okay.   And if he takes withdrawals out of there or surrenders that, how is that going to work then? |
| GUY NEUMANN: | The life insurance? |
| CW: | Yeah. |

GUY NEUMANN:     You said annuity so --

CW:              No, I meant the annuity. Let's say he gets an annuity. He owns the annuity now.

GUY NEUMANN:     He owns it. We are no longer a part of his life at that point.

CW:              Okay. So he can just surrender it?

GUY NEUMANN:     The annuity. He owns annuity. If he does the life insurance policy, we have a collateral assignment against the life insurance policy. We are not going to let you surrender the contract or do anything that will collapse the contract for at least three years after you leave.

CW:              Okay.

GUY NEUMANN:     Okay?

CW:              All right. So on the annuity, let's say he gets it, a year later he can surrender it, cash it out.

GUY NEUMANN:     But we're completely out of that equation. What he does after, we get our money for the termination.

CW:              Yep.

GUY NEUMANN:     Unless he gives us other business, chances are we are no longer a part of his life.

CW:              Okay. But is he going to get a 1099 then from the insurance company is my question.

GUY NEUMANN:     No. The 1099 from the insurance company would only come if there's gains in the insurance contract above basis and you guys know how that works. They don't have a way to monitor the transaction between a welfare benefit plan and your client. The basis in the contract remains the basis in the contract.

CW:              Okay. That's because it's not qualified.

GUY NEUMANN:     Sorry?

CW:              Because these are all nonqualified annuities, nonqualified life insurance.

GUY NEUMANN:     Right. It's a nonqualified plan. So if -- if it's a million dollar annuity, a million dollar annuity at the end of two years still has-- at the end of ten years has a surrender penalty of

| | |
|---|---|
| | some sort, chances are now he's not going to get the full million dollars out of it.  If he gets the full million dollars out of it, then anything above that million dollars is actually going to be taxable to him by the carrier on the 1099 basis. |
| CW: | Okay. |
| GUY NEUMANN: | The gain in capital above the cost of insurance. |
| UCA2: | The cost will still be the basis would be the million, right? |
| GUY NEUMANN: | Exactly.  The basis does not change. |
| UCA2: | And they wouldn't have any information to actually know, you know, what the -- they wouldn't know what the original basis was.  But the other transactions, they wouldn't know about the other transactions. |
| GUY NEUMANN: | There's no way for them to know. |
| CW: | So (UCA2) then just files that insurance company 1099 for taxes and we are set to go. |
| GUY NEUMANN: | Right.  If he decides to annuitize the contract or surrender it. |

42. At the meeting on January 12, 2010, the following exchange took place.   This exchange shows Neumann knows that terminating a plan is improper by stating that they are trying to make it look legitimate to the IRS.

| | |
|---|---|
| GUY NEUMANN: | It's a procedural thing but again look, I wanna, I wanna bring this all back to the point that, I understand where you're going with this and I appreciate the questions, but I can tell you right now that we are all making a living on the basis of paying out benefits.  Okay, that's what we're in the business of, we're a welfare benefit provider, advanced market ah provider and the reality that if we start denying claims, we put ourselves in a bad situation.  Because you see, I like your questions.  Why do I like your questions, because you're thinking about this the right way.  You're saying look we're gonna come at this with disability benefits.  I don't have a problem with you.  I like you. You're the kind of person I want selling our plan.  The problem I have is producers out there that skip over this whole idea of how to get the benefit without disability benefits and without us knowing, they're selling the plan to get in and out, and they come in, three years later or two |

years later they send us a termination letter. That's the problem that we have. That puts exposure on us. If you're telling me you're gonna stay in the five, six, seven, eight years, I have no problem.

UCA3:        You're gonna get us out and you're gonna get our money back guaranteed if we're staying that long.

GUY NEUMANN:   I have, I have no problem. That that puts me in a much stronger position that makes my life a lot easier. My issue is to start to justify to the government why this person got out for "x" amount of money after being here for two years if that ever gets challenged. That's my issue.

STEFAN CHERNESKI:     And that's a tough battle.

GUY NEUMANN:   And then, and then, and then, to the extent that that employer gets audited, they're gonna call us all, you know with the, 'cause you know you got out in two years, they're still call us, and you know what, we're gonna be obligated to help you. Why, because we don't you defending our plans.

UCA2:        Right, yeah, you wanna defend your plans.

GUY NEUMANN:   So we gotta figure out a way to sell this to the IRS as to, yeah he wanted a million dollar, he got a million dollar deduction, two years he's out of there. We're much better standing, in a much better position if he gets challenged, if the client is still in our plan, there's no question about it. This termination issue is what they, they basically attack, they found the only way to attack our plans, is through the distribution, whether the distribution is a taxable event. They're not even chal, this is so funny, at this point they're not evening challenging the employer deduction. They're not, they're not even going after the employer. They're going after the individual who took over the policy and they're calling that unearned income or, or basically undeclared income, so they're coming after them for taking a distribution and not reporting income from a distribution. Okay? That's basically what they're going after.

**Life Insurance Policies**

43. The following exchange took place during the monitored phone conversation on

October 29, 2009.

GUY NEUMANN:        Purchase of a life insurance policy has different guidelines.

UCA2:        Okay. Are the guidelines under the life insurance policy a little more?

GUY NEUMANN:        It's a little more complex than just the 10 percent. But the way it works is, life insurance policy in a benefit plan are valued at the cash value of the policy.

UCA2:        Okay.

GUY NEUMANN:        Not surrender value of the policy. So let's assume for the sake of this discussion there's a million dollar insurance policy and a hundred thousand dollars of cash value. So at the time of termination, you would technically have to pay the fair market value for that policy. That means the terminated employee will have to pay a hundred thousand dollars for that life insurance policy. What we've done is we have created a program that enables them to borrow that $100,000 by paying three years of interest up front based on the Applicable Federal Rate or the AFR. And for the past seven years I haven't seen that number go above 12 percent. If you take three years. So right now it's around 6 or 7 percent.

UCA2:        Okay.

GUY NEUMANN:        So let's assume for the sake of the discussion that number is 10 percent. So the participating employee will pay $10,000. The life insurance policy would then transfer to his control. We'll put a collateral assignment on the death benefit for a hundred thousand. So at death a hundred thousand we pay back to the trust. And to the extent it ever gets scrutinized (inaudible) the fair market value is a hundred thousand dollars.

UCA2:        So in essence we would get the life insurance benefit of 900,000 tax free.

GUY NEUMANN:        And the loan is a nonrecourse loan. That's where we are collecting 3 percent of interest up front. Three years of interest up front. We are going to bill you year four and beyond. But the note, again, is a nonrecourse note. We only collateralize a hundred thousand dollars on the face amount.

UCA2:        Okay. A hundred thousand on the face. Now, what -- what exactly would you provide (UCA1) on a -- on a termination on a life insurance policy given that scenario? What -- what documents, like 1099's or --

GUY NEUMANN:    No, there's no 1099. Again, there's no distribution.

UCA2:    Okay.

GUY NEUMANN:    We don't care about a tax deduction in the welfare benefit plan.

UCA2:    Okay.

GUY NEUMANN:    So there's not going to be forgiveness of the loan, you know, in the future or later on in life. If we don't trigger that, then there's no taxable income.

UCA2:    Okay, yeah. That's what I was saying, do you guys --

GUY NEUMANN:    There's no forgiveness of the loan. There's no taxable income.

UCA2:    Is there going to be any trigger that's -- that's going to create --

GUY NEUMANN:    There's no trigger. Basically the policy, what we did was we have to work within the constraints of the law, when the law changes we change and we're very good at that. And (The CW) can support that. We've been doing this for a very long time. So in 2005 when Revenue Procedure 2005-25 came out, we came up with this loan structure for life insurance policies. So basically this is viewed by the IRS as a different claim, the same transaction.

UCA2:    Okay.

GUY NEUMANN:    And they didn't challenge it because the reality is that no matter how you cut it, whether you borrow the money from JP Morgan and Chase for a hundred thousand dollars or from us, you are still owing us the hundred thousand dollars. So technically you bought it at the fair market value. Okay. And so it is a very, very strong transaction.

44. At the meeting on January 12, 2010, the following exchange took place. This exchange shows Neumann knows that the loan created in the termination of the plan is a pretense, and is entered into to impede the IRS.

UCA3:    Okay. Now, like you said, once in a while like these other companies, something's gonna happen where it's gonna

31

|                 |                                                                                                                                                                                                                                                                                                                                                                                                                                              |
|-----------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                 | terminate.  Let's say it terminates in two years, what's, what happens?                                                                                                                                                                                                                                                                                                                                                                       |
| GUY NEUMANN:    | We're gonna go through the same process that we talked about.  We're gonna look at the policy value if it's a life insurance contract.  We're gonna do the, you know, we're gonna look at the AFR at that point, you know, whatever that number is, we're gonna charge you for three years of interest, we collateralize the difference in the death benefit and if it's an annuity, we're gonna do the same thing, but the problem with an annuity is, you're not gonna surrender the annuity you're just gonna annuitize it, so. |
| UCA3:           | So and if it's, now assume it's the life insurance thing, so you're gonna do the, you're gonna collect the three years of interest up front…                                                                                                                                                                                                                                                                                                    |
| GUY NEUMANN:    | You can always do that.                                                                                                                                                                                                                                                                                                                                                                                                                       |
| UCA3:           | …okay.                                                                                                                                                                                                                                                                                                                                                                                                                                        |
| GUY NEUMANN:    | You're gonna sign a release and a collateral assignment.                                                                                                                                                                                                                                                                                                                                                                                      |
| UCA3:           | For that.                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| GUY NEUMANN:    | For, for the cash value and the time of the policy.                                                                                                                                                                                                                                                                                                                                                                                           |
| UCA3:           | Okay.  So, let's, let's, let's take his million dollars, assume he puts in a million dollars.  In two years he wants to terminate…                                                                                                                                                                                                                                                                                                             |
| GUY NEUMANN:    | (Talks to his two partners as an aside about taking break and starting the next part of the meeting.)                                                                                                                                                                                                                                                                                                                                          |
| UCA3:           | All right he puts in a million dollars and he goes the life insurance route.  Are you, two years down the line, whatever the reason is, he wants to terminate.  What's, what, where do we stand now?                                                                                                                                                                                                                                            |
| GUY NEUMANN:    | So we look at the value of the contract…                                                                                                                                                                                                                                                                                                                                                                                                      |
| UCA3:           | So what's the value gonna be in two years?                                                                                                                                                                                                                                                                                                                                                                                                    |
| GUY NEUMANN:    | …let's, let's say, let's say it grew to one one assuming you're a five-percent return a year okay:                                                                                                                                                                                                                                                                                                                                             |
| UCA3:           | Fine.                                                                                                                                                                                                                                                                                                                                                                                                                                         |
| GUY NEUMANN:    | Okay so now it's one one.                                                                                                                                                                                                                                                                                                                                                                                                                     |
| UCA3:           | One one in two years.                                                                                                                                                                                                                                                                                                                                                                                                                         |

GUY NEUMANN:        So just assume it's 10-percent for the sake of discussion because we don't know what the interest rates are gonna be at the time but they're gonna be around 10-percent.

UCA3:               Okay.

GUY NEUMANN:        So he pays 11, 111,000?

UCA3:               So now he's paying the 10-percent.

GUY NEUMANN:        We gonna send him, he's gonna sign a release, we're gonna collateralize the million one for 110,000.

UCA3:               Okay.

GUY NEUMANN:        Okay.   Now look, let's look at it form an economical standpoint.  First of all, we're never gonna get this money.

UCA2:               The hundred and ten.

GUY NEUMANN:        He's gonna annuitize out if before he dies, okay, he's gonna get all his money out and we're not gonna stand in the way of him doing that, okay.  This is really to make it look like it's a legitimate loan, there's no recourse against it, right?

UCA3:               Okay.

GUY NEUMANN:        If he wants to take the million dollars in three years and do a 1035 exchange into a different annuity, we're not gonna stand in the way.  You see how this works?

UCA3:               Okay.

GUY NEUMANN:        Okay.

UCA3:               You're not gonna put a lien, but you are putting a lien on it. How, wouldn't that stop him from being able to roll it over?

GUY NEUMANN:        We're not gonna stop him from doing it.

UCA3:               Okay.

GUY NEUMANN:        We're not gonna stop him, because the collateral assignment is no recourse on the interest and we're not gonna stop him.

UCA3:               Okay.

| | |
|---|---|
| GUY NEUMANN: | Okay.  That, that's not the intention, the intention is to solidify how this looks, okay. |
| UCA3: | Okay. So the hundred ten loan is only to make, if IRS or somebody comes in, it looks legitimate… |
| GUY NEUMANN: | Fair market value, correct. |
| UCA3: | …but we're not gonna, this is, for looks only, it's window dressing. |
| GUY NEUMANN: | It's window dressing… |

45. At the meeting on January 12, 2010, the following exchange took place.  This exchange shows Neumann explaining how they can receive the money tax free.

| | |
|---|---|
| UCA3: | Now what, what are the tax consequences, okay, we know the annuity, he puts in any kind of claim, he's getting it tax free, and, that, that, I mean to me that still seems the best option.  What's the tax consequence on a life insurance? Now he's paying the 10-percent, now… |
| GUY NEUMANN: | The life insurance, the life insurance is, is works the same way.  The only thing is that if you have a $10 million life insurance policy, 'cause you put a million dollars in… |
| UCA3: | Okay. |
| GUY NEUMANN: | …the cash value on that $10 million life insurance policy, the accumulated value, will only be 300,000. |
| UCA3: | After two years, okay. |
| GUY NEUMANN: | Yeah something like that, so.  So now he pays 30,000 to get out the $10 million insurance policy that has a $300,000 collateralization. |
| UCA3: | Okay. |
| GUY NEUMANN: | So, so if he's got… |
| UCA3: | So we're doing the same thing except now we're at 10 million.  So, but what's, he's paying 30,000 on the 300,000 cash value? |
| GUY NEUMANN: | That's the 10-percent (unintelligible). |

| | |
|---|---|
| UCA3: | That's the 10-percent. That's, that goes to the trust, okay. Now is he gonna get hit with tax on the 300,000? |
| GUY NEUMANN: | No. The only time the taxes on the 300,000 come into play, is if he surrenders the policy, okay? And the only tax that gets paid if you surrender a policy, is on the gaining capital of the cost of insurance. |
| UCA3: | Okay. So... |
| GUY NEUMANN: | But that has nothing to do with us.   The basis in the policy... |
| UCA3: | Hmhm. |
| GUY NEUMANN: | ...remains the same, the insurance carrier has no way of monitoring these transfers. They got $300,000 in premium from you, that's the basis. |
| UCA3: | That's what I was trying to get at, I mean, how does... |
| UCA2: | And that's what would be on the 1099 or whatever they would issue? |
| GUY NEUMANN: | If you're client does not surrender the contract, there's gonna be no 1099. If you surrender the contract in the first few years, there are gonna be no 1099's because the chances of the contract being worth more than the basis are slim. |
| UCA3: | Okay, but when he buys it out for 10-percent from you guys, there's no taxable event. He doesn't, you guys are not gonna issue a 1099? |
| GUY NEUMANN: | When he buys it out for the full market, fair market value, it's only gonna cost him 10-percent so as you're discussing this... |
| UCA3: | Okay.  So he's paying 10-percent but you're saying on paper hey you really bought it for 300,000... |
| GUY NEUMANN: | We're not just saying on paper... |
| UCA3: | ...well you're put it in the loan... |
| GUY NEUMANN: | ...it looks on paper. |
| UCA3: | ...it looks on, that's what I'm saying, you're putting it on paper. |
| GUY NEUMANN: | ...yeah no question about it, yeah. |

| | |
|---|---|
| UCA3: | But he's only paying 10-percent of that? |
| GUY NEUMANN: | Which is three years of interest up front. |
| UCA3: | And then the 90-percent you do a non ah loan non recourse? |
| GUY NEUMANN: | He's just paying the interest.  So if it's 300,000, he pays the interest we still collateralize the 300,000 not the 90-percent. |
| UCA3: | Not 90-percent.  Okay, 'cause that's the 10, okay the three years interest.  Non recourse loan, so now you're telling him that your basis in it, 300,000, because that's what the loan amount is on there. |
| GUY NEUMANN: | No, no.  The basis is what you put into the policy. |
| UCA2: | It, it's the million, right? |
| GUY NEUMANN: | The basis is still a million.  the cash value is only 300,000.  The, the insurance carrier it's, the insurance is different than the trust. |
| UCA3: | Okay. |
| GUY NEUMANN: | So if you put a million dollars into a policy that's worth $10 million in two years, right, half a million dollars each year, okay, what's your basis in that policy? |
| UCA3: | Well it's gonna be if, it's a million dollars, but you put it in pretax that's why I'm a little worried that your basis is really zero because it is not taxable dollars. |
| GUY NEUMANN: | What, what I'm asking you is, how is that gonna come into effect, if you, how is the insurance carrier gonna know, they don't adjust for it.  What I'm saying to you is that the basis in the policy gets transferred from the SADI trust to (UCA1), it's still the basis as it stands.  If you surrender the contract, they're gonna still treat the basis as the same. |
| UCA3: | Okay.  So… |
| GUY NEUMANN: | We've done thousands of these, basis is the same. |
| UCA3: | So basis is gonna be a million dollars? |
| GUY NEUMANN: | Basis is a million dollars. |

UCA3:                    And if he surrenders it and gets, I don't know what he would get out of there, ah…

GUY NEUMANN:            If he surrenders it, and there's more than a million dollars in the policy, he's gonna pay tax on the difference.

UCA3:                    On the difference.   But he gets, if he only gets a million dollars out…

GUY NEUMANN:            No tax.

UCA3:                    …no tax.  Because or the 1099 is gonna show a basis of a million?  Or is no…

GUY NEUMANN:            The 1099 is gonna show a basis of a million.

UCA3:                    'Cause you guys are telling the insurance company that the basis is a million?  How does the insurance company know what the basis is?  They just know what you put in…

GUY NEUMANN:            Whatever premiums we put into it.

UCA3:                    …you put into it.   And they don't know that it's pretax dollars that he put in there and no one knows that…

GUY NEUMANN:            First of all, there's no way for them to really know it's pretax dollars 'cause we do both non tax deductible plans. They don't monitor, they don't check to see if you take a tax deduction they're not in that business.   They're a vendor provider.  They're, they're a product provider, that's it.  You know they, they just provide the insurance policy.

UCA3:                    And you guys are not reporting that to anybody.   That doesn't go out on any 1099 or anything, basis things?

GUY NEUMANN:            No, no it doesn't, the only, in the Grist Mill trust, technically we can distribute a policy, which is the last thing you wanna do.   But if we distribute a policy in the Grist Mill trust, then there's gonna be a 1099 and you're gonna get taxed on the cash value as opposed to paying 10-percent, now you'll get taxed on the cash value.  The basis in the policy doesn't change.

UCA3:                    You're gonna get ta 'cause it's a distribution.    Ah whereas…

GUY NEUMANN:            The basis in the policy doesn't change.

UCA3:                    …even though, even though it's after, it's pretax dollars?

GUY NEUMANN:   There's no, there's no way for us, there's no way, forget the pre-tax dollars.  The basis in the policy is what the money that went into the policy is.  If somebody took a tax deduction for it along the way, there's no way to monitor that part.

UCA3:          Okay.

GUY NEUMANN:   So the basis in the policy is the basis in the policy.

UCA3:          So the IRS is never gonna know that it was, you know, let's say he surrenders it...

GUY NEUMANN:   Let's put it this way, the IRS is not smart enough to know number one and I'm being very honest with you, that's, that's...

UCA3:          Because there's too much going on, I understand that.

GUY NEUMANN:   There's too much going on.  That, that issue that you're raising right now, it's smart but it hasn't come up once in the 90 audits that I've reviewed in the course of my, in, in my experience and, that's not an issue.  Ah, you know, not only that, for the most part, where the policy is doesn't even come up.  They don't even ask you where the policy is.  They just wanna know, they don't even look at what the cash value of the pol, they don't care.  They look at, if you're out of the plan, they ask you are you in the plan anymore?  If you're not, how did you get out?  Then they start asking.  But in an audit they don't say like you know there's 54 questions on the IDR, one of those questions where is the underlying insurance policy. They don't ask.  So if you're still in the plan, you're still in the plan, they, they can't attack the distribution, they can only attack the validity of the plan, we feel like we're gonna pass.  So they attack the distribution, you've been out of the plan, you haven't done this fair market value buyout, you might have some exposure according to how we feel the IRS is going to rule in the Benistar Plan. What we got the IRS to do is to basically look at our buyouts, based on the case law at that time.  So we said anything after ah 2004, 'cause it was 2004-...19?

46.  Later in this same conversation, Neumann gives another example of a business that contributes $1 million and purchases a $10 million dollar life insurance policy. Neumann explains that after 4 years the policy may have $800,000 in surrender value.  Below is the exchange that followed.

| | |
|---|---|
| UCA3: | So year four you send him interest things, he dumps it, no one's gonna come knocking on his door, it, it's gone, it's work... |
| GUY NEUMANN: | Kevin maybe.... |
| UCA3: | So no one comes on his door, he can ignore all the rest of those. He can actually surrender it if he wants and get that 700,000 maybe 800,000 by that point? |
| GUY NEUMANN: | Right. |
| UCA3: | Now let's say he does surrender and gets 800,000, insurance company's gonna issue him a 1099? |
| GUY NEUMANN: | No. |
| UCA3: | No. |
| GUY NEUMANN: | 'Cause his basis is 950. |
| UCA3: | Nine, but don't they still, okay, so as far as, so now worst case scenario with this... |
| GUY NEUMANN: | They might issue a 1099 for zero. |
| UCA3: | For zero. |
| GUY NEUMANN: | And just to show that... |
| STEFAN CHERNESKI: | Just to show that it actually... |
| GUY NEUMANN: | ...just to show that (unintelligible), there's gonna be no taxable event. |
| UCA3: | So worst case scenario he's taking a deduction on the million dollars in this year, four years down line he's getting $800,000 back out that he doesn't have to pay tax on. |
| GUY NEUMANN: | Right. It might be even higher. |
| UCA3: | Depending on how it goes in there. But there's not gonna be a tax effect back there once he gets this money out? |
| GUY NEUMANN: | No. |
| UCA3: | So he's, I mean worst case scenario he just, you know, avoid, avoided paying tax on this money and then got it all out tax free. |

GUY NEUMANN:        Yes.

UCA3:               And...

GUY NEUMANN:        He's a, we're talking worst case scenario, right?

UCA3:               ...worst case scenario is and if he cashes it out...

GUY NEUMANN:        Best case scenario is (unintelligible)...

UCA3:               ....needs the money, wants to run off...

GUY NEUMANN:        ...the best case scenario in year four he starts to get money out and by year nine he's gotten over a million dollars out.

UCA3:               And it's all tax free still then...

GUY NEUMANN:        Tax free.

UCA3:               ...because no one's looking at the basis or 1099's.

GUY NEUMANN:        And let's, and let's not minimize the fact that while he's in the plan he gets the asset protection and if something was to happen to him, his heirs are gonna get this money income, estate and gift tax free...

UCA3:               Tax free.

GUY NEUMANN:        ...let's not minimize that.

UCA3:               No we're not , and, and he's telling me you know, what's the worst thing that's gonna happen to me?  You know. Am I, am I gonna be stuck in a life insurance that I'm not gonna be able to get any money out, I'm not gonna be able to enjoy for during my lifetime, you know if I say the hell with all this, the hell with everybody I want my money to go and just go off and, you know, and play with it, whatever I wanna do with it, can I do it and what's gonna be the consequence?  And then he is, you know, you know, we, we do some procedural paperwork and get you out as a disability tax free over 60 months you don't need lump sum for any reason and if you need some lump sum for some reason, you're getting a deduction now when you're in a high tax bracket and then getting it out tax free later on.

GUY NEUMANN:        That's it, you got it.

**Backdating of Documents**

47. Guy Neumann coached UCAs 1, 2, and 3 to backdate documents in order for UCA1's business to receive a 419 plan contribution deduction in a year when no contribution was actually made. UCAs 2 and 3 purported to Neumann that UCA1's business was an accrual basis C corporation with a year end of September 30th. During the contacts, the UCAs and Guy Neumann discussed if UCA1 could fund a SADI 419 plan for 2009 even though September 30th had already passed. Pursuant to the conversations, Neumann did in fact accept SADI 419 Plan enrollment documents for UCA1 that were backdated to September 30, 2009 in addition to a $1,500 enrollment fee check that was backdated to September 30, 2009.

48. In regards to the backdating of documents, the following exchange took place on October 29, 2009:

GUY NEUMANN:    What I was going to suggest to you guys, given the information you provided is that if you choose to take this route, the contribution to SADI, you would have already had to create the liability for that contribution since you have a year-end of 9-30?

UCA 2:    Right.

GUY NEUMANN:    Technically we need the enroll documents dated 9-30 or before that, but then you can fund up to his -- up to the time of filing the trust. I assume he's an accrual taxpayer as a C corp.

UCA 2:    Right.

GUY NEUMANN:    So the law says that if you incur liability within your taxable year, we're a few days behind that at this point. So I think the best thing for your client to do while he is figuring this out is to enroll in the plan and then we can go ahead and back into the deduction -- into the contribution and so forth. But at least we'll have documents to support the contribution if and when he's ready to make that contribution.

41

UCA 2:               So what you're saying is -- is I just -- we go ahead and incur the liability on the books for the 30 year-end and we would have to have the enrollment documents dated -- dated September 30.

GUY NEUMANN:         (The CW) has the enrollment documents.

UCA 2:               Okay.

GUY NEUMANN:         The enrollment documents will be submitted with a $1,500 fee. It's an admin fee. The instructions are clearly stated on the checklist above that form. It's a one-page form. It won't take you very long to complete. Everything else we can back into to the extent this makes sense to you.

UCA 2:               Okay.

GUY NEUMANN:         But what we need to do is we need to get you in the plan with an enrollment document dated prior to 9-30 for you to be able to legally make the contribution prior to you filing the taxes and receive a deduction for that contribution.

UCA 2:               Okay.

GUY NEUMANN:         Okay?

UCA 1:               So if we enroll in these, do I need to, as far as the payment, what do I --

UCA 2:               I would just book the liability now and you would do the enrollment. So -- so -- so we could keep it in your previous tax year.

GUY NEUMANN:         And then once -- and then once you do that, you know, we can go through any other questions or information that you may need to reach your decision and also figure out exactly what your monetary contribution is going to be and what you want to use to fund, whether it's life insurance or an annuity.

49. On January 12, 2010, the following exchange took place while discussing a $1,500

check dated September 30, 2009 for the enrollment fee of UCA1 into the SADI 419

Plan:

GUY NEUMANN:         The ah admin fee needs to be made out to NOVA.

| UCA2: | Okay. |
|---|---|
| GUY NEUMANN: | The contribution check needs to be made out to SADI, just so you know. |
| UCA2: | Okay, so, so… |
| GUY NEUMANN: | But the contribution is driven by the, the deduction is driven by the contribution to the plan not to the admin. |
| UCA3: | Okay.  Oh, okay, to the plan, but once, since this is dated September 30th, he's good for the deduction for that year? |
| GUY NEUMANN: | Yeah. |
| UCA3: | No one's gonna say anything? |
| GUY NEUMANN: | We'll process it.  No. |
| UCA3: | Okay, it doesn't have to be notarized or anything to confirm the date? |
| GUY NEUMANN: | No he hasn't filed his taxes yet. |
| UCA3: | No, not even close. |
| GUY NEUMANN: | So yeah he's okay. |
| UCA3: | So no one, as far as we're concerned… |
| GUY NEUMANN: | Right. |
| UCA3: | …you know, we just pretend like it was signed back then. |
| GUY NEUMANN: | Exactly. |

**Form 8886**

50. In 2000, the IRS published Notice 2000-15, in which it formally "listed" transactions in

Notice 95-34[2] as tax avoidance transactions which, in the view of the IRS, subjects

---

[2] <u>Notice 95-34</u> discusses tax problems raised by certain trust arrangements seeking to qualify for exemption from IRC section 419. This transaction involves the claiming of deductions under IRC sections 419 and 419A for contributions to multiple employer welfare benefit funds. In general, an employer may deduct contributions to a welfare benefit fund when paid, but only if the contributions qualify as ordinary and necessary business expenses of the employer and only to the extent allowable under IRC sections 419 and 419A.  There are strict limits on the amount of tax-deductible pre-funding permitted for contributions to a welfare benefit fund. IRC section 419A(f)(6) provides an exemption from IRC sections 419 and 419A for a welfare benefit fund that is part of a 10 or more employer plan. In general, for this exemption to apply, an

43

the 419 program to the disclosure requirements of IRC Section 6112 as a "potentially abusive tax shelter". However, NOVA takes the position that Form 8886, Disclosure by Tax Exempt Entity Regarding Prohibited Tax Shelter Transaction, does not have to be filed for their participants based on their argument that they are not substantially similar to Notice 95-34. Therefore, NOVA does not require participants to file Form 8886. Based on the investigation to date, it appears that NOVA's 419A(f)(6) plans are being used as abusive tax shelters and that Forms 8886 should be filed for participants. Due to Forms 8886 not being filed, the IRS is unaware of NOVA's 419 plan participants and therefore cannot monitor how the plans are being used.

## USE OF DIFFERENT ENTITIES

51. Guy Neumann gave the following background on Benistar and NOVA. Benistar is a third party administrator that was founded in 1994. Benistar focused on 419 welfare benefits plans, but they also provided services such as employee stock option plans and various other types of estate planning. The Benistar 419 Plan was started in 1997 and within six years the Plan had over 4,000 participating employers and took in over $1 billion in premiums. In 2003, the IRS issued new regulations for 419 plans like Benistar. Neumann said that the new regulations made them change gears. At that point, they decided to come out with two new companies, NOVA Benefit Plans

---

employer normally cannot contribute more than 10 percent of the total contributions contributed under the plan by all employers, and the plan must not be experience rated with respect to individual employers.

Promoters have offered trust arrangements that are used to provide life insurance, disability, and severance pay benefits. The promoters enroll at least 10 employers in their multiple employer trusts and claim that all employer contributions are tax deductible when paid, relying on the 10-or-more-employer exemption from the limitations under IRC sections 419 and 419A. Often the trusts maintain separate accounting of the assets attributable to each subscribing employer's contributions. Notice 95-34 puts taxpayers on notice that deductions for contributions to these arrangements are disallowable for any one of several reasons (e.g., the arrangements may provide deferred compensation, the arrangements may be separate plans for each employer, the arrangements may be experience rated in form or operation, or the contributions may be nondeductible prepaid expenses).

and Benefit Plan Advisors and each company then had their own selection of 419 plans. They then had a "nice run" (Neumann's words) with NOVA and Grist Mill in particular until the end of 2007 when new regulations again came out. At that point, US Benefits Group was created which bought out Benefit Plan Advisors. US Benefits Group was created to be a sales and marketing arm for all the companies involved and bring all of the companies under one umbrella. Neumann said that they had a few hundred million dollar run with the Grist Mill Trust and NOVA Benefit Plans. Neumann also stated that they have to work within the constraints of the law, and said when the law changes we change and we are very good at that. Referring to 100 Grist Mill Road, Neumann stated that the reality is everything happens in this 48,000 square foot building. Neumann said that we own the whole building, this is all Benistar. Neumann said that there are a couple of independent companies within Benistar that basically rent space from Benistar like US Benefits and Rex Insurance Service. Neumann was asked by UCA2 if he was with US Benefits Group and Neumann responded, "We all wear multiple hats, I ran Benefit Plan Advisors. We got bought over by US Benefits. We used to walk into a meeting and, you know, depending upon who we are, give you a Benefit Plan card or a NOVA card or a US Benefits card or, I literally have eight cards..."

52. The CW stated that during 2005, he heard that Benistar was getting a lot of heat from the IRS for the plans that they were selling. The CW's understanding was that due to the pressure from the IRS, Benistar went out of business and NOVA was started in its place. The CW said that NOVA was basically the same as Benistar; it just had a different name. The employees at NOVA were the same employees that worked for Benistar.

**EVIDENCE THAT NOVA CONTROLS, OCCUPIES, AND STORES RECORDS AT 100**

**GRIST MILL ROAD, SIMSBURY, CONNECTICUT**

53. Tax return information obtained from an IRS database show that the address on file with the IRS for NOVA Benefit Plans, Benistar, Benefit Plan Advisors, and US Benefits Group is 100 Grist Mill Road, Simsbury, Connecticut.

54. The CW received a FedEx envelope with a shipment date of October 21, 2009 showing a return address of Benefit Plan Advisors, 100 Grist Mill Road, Simsbury, CT 06070. The envelope contained a NOVA Benefit Plans, LLC folder which contained a NOVA Benefit Plans, LLC brochure and SADI enrollment documents. The SADI enrollment documents state that that completed package with application, forms and check should be sent to: Sickness, Accident, Disability & Indemnity Trust 2007, NOVA Benefit Plans, LLC, NOVA Plaza, 100 Grist Mill Road, Simsbury, CT 06070. The folder also contained a Benefit Plan Advisors, LLC business card for Guy Neumann. The business card listed an address of Grist Mill Plaza, 100 Grist Mill Road, Simsbury, CT 06070.

55. The CW stated that if he mails correspondence, forms, or documents to NOVA he sends it to 100 Grist Mill Road, Simsbury, CT 06070.

56. On January 11, 2010, I conducted a drive-by of 100 Grist Mill Road, Simsbury, Connecticut. Upon approaching the building, I observed a building directory sign that showed the only occupant of the building as Benistar.

57. On January 12, 2010, UCA2 and UCA3 went to 100 Grist Mill Road, Simsbury, CT for a scheduled meeting with Guy Neumann and other representatives of NOVA.

Upon entering the building, the UCAs entered a reception area. Behind the receptionist in large letters was "BENISTAR". UCA3 asks the receptionist if this is Benistar or if this is NOVA and the receptionist responds "NOVA". During the meeting on January 12, 2010, Neumann stated that Benistar owned the building that they were in. Neumann said that the building is 48,000 square feet and that they currently occupy 24,000 square feet with 24,000 square feet still available. Per Neumann, there are approximately 70 employees at the Grist Mill location. Neumann took the UCAs on a tour of the office building. Per the UCAs, the building has numerous rooms full of file cabinets and numerous file cabinets throughout the building. In addition, there were stacks and boxes of files located throughout the building located in workstations, offices, and conference rooms. The UCAs observed numerous computer workstations throughout the building. During the tour, Neumann pointed out a computer server room and stated that they have a full IT staff that is constantly on premise with their system. During the meeting Neumann also mentions that they have a database that monitors participating employers.

58. During the course of the investigation, the CW and UCA2 corresponded with Neumann via E-mail. On October 21, 2009, the CW received an E-mail from Neumann which contained NOVA plan documentation, an enrollment package, and a legal opinion. On February 9, 2010, UCA2 received an E-mail from Neumann which included enrollment documents for NOVA's Long Term Care Trust. Neumann is known to have multiple E-mail addresses, including:

gneumann@benefitplanadvisors.com, gneumann@rexisinc.com, gneumann@usbenefitsnetwork.com

59. Through my training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activity, including tax returns, investment information, ledgers, journals, invoices, receipts, bank documents, E-mails, and other pertinent items and correspondence. A large part of my duties as an IRS-CID Special Agent involve analyzing these types of records to determine the existence of criminal activity and to develop evidence of criminal activity. Based upon my training, experience, and participation in financial investigations involving income tax and money laundering violations, I am aware of the following:

   a) It is necessary for businesses, in the ordinary course of business, to maintain adequate books and records of accounts to determine gross receipts and expenses in order to determine the amount of profit and taxable income generated by the business. Such records typically include ledgers, journals, receipts, invoices, bank and investment account statements, income tax returns, and payroll records;

   b) It is common practice for individuals, who are involved in business activities of any nature, to maintain books, records, correspondence, and notes of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible, such as their offices, businesses, or personal residences. Businesses store and maintain their records in desks, both locked and unlocked, filing cabinets, both locked and unlocked, files and file folders as well as safes.   Business records tend to remain at the same location for extended periods of time, often years.

c) Based on my training and experience I know that businesses keep these types of records in hard-copy and electronic format.

## STATUS OF CIVIL INVESTIGATIONS

60. NOVA, including Wayne Bursey as NOVA's representative, is currently the subject of an IRS civil investigation for promoting potentially abusive tax shelters. The civil investigation is currently stalled due to the fact that Bursey has not complied with a summons. The civil division is currently pursuing summons enforcement activities in order to force Bursey to comply.

61. Benistar, including Daniel Carpenter as Benistar's representative, is also currently the subject of an IRS civil investigation for promoting potentially abusive tax shelters. The civil investigation is currently stalled due to the fact that Carpenter has not complied with a summons. The civil division is currently pursuing summons enforcement activities in order to force Carpenter to comply.

## PREMISES WHERE EVIDENCE OF VIOLATIONS MAY BE FOUND

62. This affidavit is submitted in support of my application for a search warrant for the following location:

The business of NOVA Benefit Plans, also known as Benistar, also known as US Benefits Group, also known as Benefit Plan Advisors located at **100 Grist Mill Road, Simsbury, Connecticut 06070**, which is more particularly described in **Attachment A** to this affidavit.

**COMPUTER EVIDENCE**

**SEIZURE OF EQUIPMENT AND DATA**

63. Your affiant recognizes that NOVA is a functioning company with dozens of employees, and that a seizure of NOVA's computer network may have the unintended and undesired effect of limiting the company's ability to provide service to its legitimate customers who are not engaged in the activity under investigation.  In response to these concerns, it is the government's intention to first attempt to create electronic images or copies of the systems on-site if possible or practical. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer expert or another technical expert will then conduct an off-site search for the computer files described in the warrant from the "mirror image" copy at a later date.

64. Based upon your affiant's knowledge, training and experience, I am aware that the records and documents described on the attached list of "Items to Be Seized" may be in the form of paper or stored electronically on computer hardware or some other form of electronic media.

65. Based on my knowledge and training and the experience of other agents with whom I have discussed this investigation, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer

equipment, peripherals, related instructions in the form of manuals and notes as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting.   This is true because of the following:

66. **The volume of evidence.**  Computer storage devices (such as hard disks, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information.  Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names.  Searching authorities are required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis on-site.

67. **Technical requirements.**  Searching computer systems for criminal evidence can be a highly technical process that can require expert skills and a properly controlled environment.  It is often difficult to determine the hardware and software used on a system to be searched before the search is executed, and the vast array of computer hardware and software available required even computer experts to specialize in some systems and applications.  As a result, it is difficult to know prior to a search: (1) whether a specific expert or search protocol may be required; (2) if so, which expert may be qualified to analyze the system and its data; and (3) whether and what type of controlled environment may be required.  Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Because

computer evidence can be vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system, such as a booby trap), a controlled environment may be necessary to complete an accurate analysis.  Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that, if necessary, a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

68. As previously discussed, if creating electronic images of the systems on-site is not possible or practical, agents will seize the computer hardware and peripherals as necessary to ensure recovery of all the evidence and to ensure that all contraband has been removed from NOVA's computer system.  If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

## ANALYSIS OF ELECTRONIC DATA

69. The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file directories and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence and instrumentalities authorized for seizure by the warrant); opening or reading the first

few pages of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

## STATUTES VIOLATED

70. There is probable cause to believe that at these premises are evidence, fruits, and instrumentalities of criminal offenses against the United States, namely, 18 U.S.C. § 371, Conspiracy to Impede the Lawful Function of the IRS and 26 U.S.C. § 7206(2), Aiding and Assisting in the Preparation of False Income Tax Returns.

## CONCLUSIONS

71. WHEREFORE, I respectfully submit that there is probable cause to believe that the items described in Attachment B of this affidavit are evidence of the crimes described in this affidavit and are currently located at the premises of NOVA Benefit Plans, also known as Benistar, also known as Benefit Plan Advisors, also known as US Benefits Group, located at 100 Grist Mill Road, Simsbury, CT 06070 and that a warrant be issued for the search of these premises.

SHAUN SCHRADER
IRS-CID

Subscribed and sworn to before me this _16_th day of April, 2010.

HONORABLE THOMAS P. SMITH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

The location to be searched is located in Hartford County at **100 Grist Mill Road, Simsbury, Connecticut 06070**. The property is described as a single story office building. The lower portion of the building consists of red brick and windows, while the upper portion of the building consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road.  At the bottom of the driveway is a red brick structure with a sign attached to it that says "100 GRIST MILL RD". At the top of the driveway, as you approach the parking lot, is a wooden sign that reads "DIRECTORY, ENTRANCE 1, BENISTAR". There is no signage on the exterior of the building itself.

 In order to minimize the prospect of the removal and subsequent destruction of any documents and/or records described in Attachment B to the Search Warrant Affidavit, the search will include locked or unlocked briefcases, safes, file cabinets and other security storage containers located on the premises to be searched.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following items maintained by and/or on behalf of **NOVA BENEFIT PLANS, LLC; BENISTAR; BENEFIT PLAN ADVISORS; BENISTAR 419 ADVANTAGE PLAN; BENISTAR 419 PLAN & TRUST; NOVA SICKNESS, ACCIDENT, DISABILITY & INDEMNITY TRUST; US BENEFITS GROUP, INC; NOVA LONG TERM CARE TRUST; NOVA LIFE ONE PLAN & TRUST; GRIST MILL TRUST** and any other trusts, businesses or entities that promote, administer, or utilize 419 plans for the time period of 2004 to present:

1.   Any and all documents and records that relate to current and former clients/participants (employers and beneficiaries) of 419 plans including client lists, complete client files, client databases, contracts, financial information, applications, enrollment documents, benefit summaries and disclosures, certificates of coverage, billing information, termination documents, claim documents, correspondence, contact information, and records of payments received from and made to clients/participants disclosing date, amount, and purpose of each payment.

2.   Records disclosing and documenting where and how funds from clients/participants are invested, including but not limited to life insurance and annuity contracts, insurance applications and agreements, account statements, correspondence, Forms 1099, and records showing dates and amounts of premiums paid, receipts, and disbursements.

3.   Any and all trust documentation to include declarations, contracts, extracts, indentures, agreements, certificates, bylaws, correspondence, minute books including any minutes of meetings with the trustees, trust records reflecting formation of trust and designation of trustees and control of the trusts. All financial statements, bookkeeper's and/or accountant's work papers used in the preparation of trust records or tax returns. Retained copies of all federal and state tax returns.

4.   All bookkeeping records and other financial records including general ledger, general journals, all subsidiary ledgers and journals, gross receipts and income records, cash receipts and disbursement records and/or journals, accounts receivable and payable ledgers and records, bad debt records, loan receivable and payable ledgers, voucher register and all receipts and expenses invoices including all invoices documenting expenses paid by cash (currency ) or bank check (cashier or teller checks) and retained copies of any bank checks (cashier or teller checks.)

5.   Records of any loans to clients/participants including applications, checks (front and back) issued for loans, repayment records including records revealing the date, amount, and method of repayment (cash or check), and copies of checks (front and back) used to repay loans.

6.      Any and all financial records reflecting income and expenses including: bank statements, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, records reflecting the identity of checks deposited, withdrawal slips, and records disclosing the disposition of withdrawals, Forms 1099, debit and credit memos. Cancelled checks (front and back), check stubs, check requisition forms and/or check authorization documents, check registers, deposit slips, money orders and money order receipts, cashier checks and cashier checks receipts, ledgers, journals, wire transfers, debit advice, letter instructions regarding transfer of funds, bank notices, credit memos, trust accounts, brokerage accounts, loan files, and all other records reflecting any cash receipts and cash disbursements, and any other records relating to bank accounts.

7.      Corporate minute books, stock register or other records reflecting ownership of corporate stock.  All financial statements, bookkeeper's and/or accountant's workpapers used in the preparation of corporate records or tax returns. Retained copies of all federal and state income, payroll and excise tax returns.

8.      Legal opinions and arguments regarding 419 plans as well as supporting documentation.

9.      Any and all documents pertaining to the solicitation or recruitment of clients and potential clients including advertisements, brochures, educational materials, promotional materials, legal opinions, and tax guidance.

10.     Any and all information, records, and correspondence related to brokers, middlemen, and others who promote 419 plans who are not directly employed by the above.

11.     Any and all documents, notes, letters, memoranda, correspondence, communications, and electronic mail messages (e-mails) between employees, current and former client/participants, insurance companies, brokers, and other related parties.

12.     Appointment records, diaries, calendars, message logs and other documents used to record schedules, meetings, conversations, or other events. Address books (including electronic address books, such as devices commonly referred to as electronic organizers), message logs, phone call message slips, or other indicia of notation of messages and telephone numbers.

13.     Any and all copies of IRS publications and documents. IRS Tax Manuals, correspondence, and notices.  Instruction or reference materials containing information about tax, trusts, and tax avoidance schemes.

14.     All information or data covered by the above paragraphs that has been stored in the form of magnetic or electronic coding on computer media or media capable of being read by a computer or with the aid of computer-related equipment, including but not limited to floppy disks, fixed hard disks, removable hard disks,  tapes, laser disks, videocassettes, CD-ROMs, DVD disks, Zip disks, smart cards, memory sticks, memory calculators, personal digital assistants (PDAs), cell phones, and/or other media that is capable of

storing magnetic coding, the software to operate them and related instruction manuals.

15.     All electronic devices capable of storing, analyzing, creating, displaying, converting, or transmitting the electronic or magnetic computer impulses or data.  These devices include, but are not limited to:  computers, computer hardware, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external drives, fax machines, and all written, published or printed materials which provide instructions concerning the operation of the above listed computer equipment software.

16.     All instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer, including but not limited to: operating systems, application software, computer passwords and data security devices, and software used to communicate with the equipment described above.